**F. D. RICH HOUSING OF THE VIRGIN ISLANDS, INC., as Assignee of F. D. Rich Housing of Puerto Rico, Inc., Plaintiff**

**v.**

**GOVERNMENT OF THE VIRGIN ISLANDS, Defendant**

Civil No. 76-62

**HEYL & PATTERSON INTERNATIONAL, INC., Plaintiff**

**v.**

**F. D. RICH HOUSING OF THE VIRGIN ISLANDS, INC. and F. D. RICH HOUSING CORP., Defendants**

**v.**

**GOVERNMENT OF THE VIRGIN ISLANDS, Third-Party Defendant**

Civil No. 75-785

District Court of the Virgin Islands

Div. of St. Thomas and St. John

May 23, 1980

411

412

413

415

RICHARD E. GRUNERT, ESQ. (GRUNERT, STOUT, HYMES & MAYER), St. Thomas, V.I., *for plaintiff F. D. Rich Housing of the Virgin Islands, Inc., as assignee of F. D. Rich Housing of Puerto Rico*

PHILIP PAHIGIAN, ESQ. (ISHERWOOD, ALKON, BARNARD & DIEHM), Christiansted, St. Croix, V.I., *for defendant F. D. Rich Housing of the Virgin Islands, Inc.*

IVE ARLINGTON SWAN, ESQ., Attorney General of the Virgin Islands, LENA A. WILSON, ESQ. (Department of Law), St. Thomas, V.I., *for third-party defendant Government of the Virgin Islands*

CHRISTIAN, *Chief Judge*

## MEMORANDUM OPINION

These consolidated actions arise out of an unsuccessful attempt to construct a middle income housing project at Estate Nazareth, St. Thomas. For our purposes, the scenario opened on October 1, 1973, when, after lengthy negotiations, F. D. Rich Housing of the Virgin Islands, Inc., signed an Agreement with the Government of the Virgin Islands. The Agreement called for the development of 100 units in the first phase of the Nazareth project and left open the possibility of an additional 200 units. In its role as developer, Rich contracted for Heyl & Patterson International, Inc., to serve as general contractor of the Nazareth project. For a variety of reasons the project never moved past the stage of planning and ordering of materials. Heyl & Patterson has sued Rich for breach of contract and requests consequential damages. Without conceding liability to Heyl & Patterson, Rich has failed a third party action against the Government for indemnification for any liability it may have to Heyl & Patterson as well as for its own consequential damages. A

separate action commenced by Rich against the Government for the identical remedies, No. 76-62, has been consolidated with the case presently before the Court.

## I. RICH v. GOVERNMENT

For conceptual clarity, it is preferable to begin our analysis with the claims of Rich against the Government. Rich's theory of recovery is straightforward; it had a contract with the Government which was breached and, therefore, it is entitled to damages. The Government's defense may be broken into four categories. Firstly, the Government contends that the Agreement was not supported by consideration moving to the Government and, therefore, there was no binding contract. Secondly, the Government argues that Rich exercised an option pursuant to the Agreement under which Rich could complete the project alone and, accordingly, the Government was completely discharged from further responsibility under the Agreement. Thirdly, the Government maintains that it lacked capacity to enter a contract because of four separate statutory prerequisites with which there had been no compliance. Specifically, the Government points to the requirements of (1) adequate appropriations, 33 V.I.C. § 3101, (2) legal transfer of the necessary land to the Department of Housing, 29 V.I.C. § 191c, (3) Government adoption of a Housing Development Plan, Act No. 3088, 1971 V.I. Sess. Laws at 313–314, and (4) compliance with statutory cost limitations on middle income housing, 29 V.I.C. § 191n. Since the Government's illegality defenses successfully invalidate the alleged contract, the Court does not reach the Government's final defense that Rich materially breached the Agreement. For the same reason, the Court does not discuss the alleged breaches of the Government or the question of damages.

### A. CONSIDERATION

■ The Government first argues that the October 1, 1973, Agreement does not qualify as a contract upon which Rich can base this action since it provides for no consideration to the Government. The RESTATEMENT OF CONTRACTS § 75(1) defines consideration for a promise as:

(a) an act other than a promise, or
(b) a forbearance, or
(c) the creation, modification or destruction of a legal relation, or
(d) a return promise, bargained for and given in exchange for the promise.

■ In light of this definition, the Agreement clearly supplies the Government with sufficient consideration to support a contract. Primarily, as stated in the introductory sections of the Agreement, the Government's goal of encouraging construction of desirable middle income housing is advanced. This objective is solidified by the Government's power to designate the prices of the dwellings (paragraph VII A) and the Government's right to approve plans and specifications (paragraph VIII A). A secondary governmental aim, expeditious construction of the desired buildings, is ensured by the liquidated damage clause for delay provided in paragraph VI B and VI D of the Agreement. In addition, paragraph IV A requires Rich to pay $7,000 per acre in cash for the land at Estate Nazareth upon which the project was to be built. Obviously, therefore, the absence of consideration is not a defect in the Agreement at issue. Accordingly, the Court need not pursue Rich's contention that consideration might also be found in the advantages to be received by potential purchasers of the homes, the Virgin Islands citizens who were allegedly third-party beneficiaries of the Agreement.

## B. EXERCISE OF OPTION AND DISCHARGE

■ As its second defense, the Government maintains that Rich exercised its option under paragraph XI of the Agreement to elect to perform site improvements at its cost in the event the Government was unwilling or unable to fulfill its obligation to perform those improvements. If that is true, then subparagraph XI(B)(3) of the Agreement automatically became operative and, therefore, the Government would be completely discharged from further performance under the Agreement. However, examination of the two letters on which the Government relies to support its contention defuses the Government's theory. These letters, exhibits GVI-Y and GVI-Z, merely evidence a proposal whereby Rich would perform the relevant site work in exchange for monetary compensation directly from the Government. This proposal is significantly different from the option, contained in subparagraph XI(B)(2), which entitles Rich to charge purchasers higher prices for the dwelling units as compensation for performing the site improvements. This crucial distinction as to who pays Rich in combination with the fact that the Government never formally agreed to the Rich proposition signifies that Rich did not elect to proceed pursuant to its option to perform the site work. Thus, the Government was not discharged from its duties under the Agreement because of any exercise of an option by Rich.

## C. ILLEGALITY OF THE AGREEMENT

Prior to discussing the Government's illegality defenses themselves, the Court must address Rich's contention that the Government has waived all defenses premised on the illegality of the Agreement except for the defense of the absence of an appropriation. Rich maintains that such a waiver occurred when the Court granted the Government leave to file an amended answer. Rich had objected to the motion to amend on the ground that the Government's new Fourth Affirmative Defense which alleged illegality of the Agreement was too vague. The Government filed a Reply which specified the absence of an appropriation as the source of the illegality asserted in the Fourth Affirmative Defense. As a result, in its March 6, 1979, Memorandum Opinion the Court accepted the Government's clarification as remedying Rich's vagueness objection. Rich's present contention is that the Court's statement is tantamount to a grant of the amendment on terms. See 3 MOORE'S FEDERAL PRACTICE ¶15.08[6] at 15-124 to 125 (2d ed. 1979). In effect, Rich argues that the grant of leave to amend the answer was conditioned upon the Government waiving any additional defenses based on the illegality of the Agreement.

■■ Rich's theory, that regardless of the Agreement's illegality, the Court cannot consider the relevant statutes, is unacceptable. It is perhaps fair to conclude that the Government should be prohibited from utilizing its Fourth Affirmative Defense to assert defenses other than the absence of an appropriation. However, no further inferences can be gleaned from the Court's opinion. Certainly, a party is able to amend its pleadings at any time up to, during, and even after trial. C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE: Civil § 1488 at 438 (1971). Thus, the Government was free to move to amend its answer at any time during the trial. That is precisely what the Government did when it raised its alternative illegality defenses in its opening statement. The sole limitation upon the Court's "liberal" discretion to grant leave to amend, even at that late date, is an affirmative showing that the Government "has been guilty of delay in requesting leave to amend and, as a result of the delay, the proposed amendment, if permitted, would have the effect of prejudicing . . ." Rich. Id. at 439. Aside from a bit of puffing, such a showing, especially as to the requirement of prejudice from the delay, is conspicuously absent from Rich's memoranda. Accordingly, all affirmative defenses asserting illegality of the Agreement will be examined by the Court.

(1) *Adequacy of Appropriations*

■ The first illegality defense raised by the Government labels the Agreement a nullity because it attempts to commit government funds without, or in excess of, any prior appropriation. See 33 V.I.C. § 3101. This Court has held that a contract not executed in conformity with a legislative appropriation of funds is void. Sargeant v. Government, 10 V.I. 245, 248 (D.V.I. 1973). The rationales expressed in Sargeant are equally applicable in the case at bar. Firstly, § 3 of the Revised Organic Act forbids payment out of the Virgin Islands Treasury except pursuant to an Act of Congress or a "money bill" of the local legislature. Secondly, 31 V.I.C. §§ 248–249 state that a contract on behalf of the Government not under an appropriation adequate to its fulfillment "shall be null and ineffective". See Sargeant v. Government, 10 V.I. at 245–46. While conceding that Sargeant states the controlling law, Rich contends that Sargeant is inapposite because the Government has failed to satisfy its burden of proving the absence of sufficent appropriations. See Fed. R. Civ. P. 8(c) (illegality is an affirmative defense).

■ The first step in evaluating the sufficiency of the appropriations is to determine the extent of the Government's financial obligations under the Agreement. Two duties which devolved upon the Government can be characterized as financial; the Government is obligated under paragraph IV B to do the site improvements for the Nazareth project and under paragraph X to purchase units not sold to the public. In the abstract, the Government's obligation to purchase unsold dwellings is immense. The maximum exposure is approximately $2.5 million assuming the average price per unit to be $25,000 and no unit would ever be sold to the public. In light of the facts of the case at bar, however, the potential liability is of minimal significance. According to Joseph Simmonds, Business Manager of the Department of Housing, by October 1, 1973, there was already $66,100 in deposits in the Moderate Income Housing Special Deposit Account. Thus, at the time the Agreement was signed, at least 66 of the 100 units were spoken for. Simmonds also testified that shortly thereafter the Account contained over $91,000 representing at least 91 purchasers. Moreover, testimony such as that of Irwin Silver demonstrates the proposed selling prices were significantly below market value and, therefore, there would be no difficulty in selling the units. Thus, the combination of a high number of deposits and the bargain price indicates the slight

likelihood of the need ever arising for the Government to purchase unsold units.

In addition, there exists a completely different basis for ignoring the Government's potential purchase liability since it is questionable whether Rich could enforce the purchase provision. See 1A GOVERNMENT CONTRACTS § 8.20[5] at 8-21 (1979) (stating that clauses obligating the federal government to indemnify a contractor against third-party claims are limited to the unexpended balance of an appropriation. This passage also suggests that contingency clauses do not invalidate a contract despite the fact that the clause may result in governmental liability in excess of an appropriation.) Regardless of the provision's enforceability, however, it would be incorrect to hold that the potential for an unlikely contingency to arise during the final stage of a contract should serve to nullify the existence of the entire contract at the outset.

The extent of the Government's other financial obligation under the Agreement, the site work, can be predicted with greater accuracy. Darwin Creque, the Commissioner of Housing on October 1, 1973, the date the Agreement was signed, testified that as of that date the Department of Public Works would have required $1.5 million to complete the site work. Gordon Finch, the Commissioner of Public Works from February 1975 to March 1979, testified that as of October 1973, the site improvements would cost $1.1 million. Finch's appraisal was based on the discounted value of the $1,325,000 estimate he made of the cost as of March 14, 1975. (Exh. GVI-F.) Finally, on behalf of Rich, Edmund Strack proposed to do the site work for $1.3 million on February 14, 1975. (Exh. GVI-Z.) This amount would also be discounted to approximately $1.1 million to account for the one and one-half year span between the estimate and October 1973. Since the latter two estimates substantiate one another and since individuals calculating those estimates[1] are extremely familiar with the variables involved, the Court concludes that $1.1 million was the amount of the site work obligation which the Government undertook in October 1973.

The Government has raised the possibility of one additional financial obligation imposed on it by the Agreement. That is Exhibit GVI-O, a change order sent by Commissioner Creque to Rich on October 16, 1974. According to the change order, Rich

---

[1] Gordon Finch was Commissioner of the Department of Public Works for four years. Edmund Strack is an experienced construction contractor and was Rich's vice-president in charge of the Estate Nazareth Project.

would take on the Government's duty to attempt to provide a commitment for permanent mortgage loans in exchange for a Government promise to pay Rich $1,200 per unit at the time of sale and a reduced price for the Nazareth land. Rich's response, that this additional cost would be passed on to the purchasers, is without factual support, especially in view of the unambiguous language of the order. However, a change order unsupported by an appropriation could not be enforced by the developer. See 1A GOVERNMENT CONTRACTS § 820[1] at 8-15. Thus, the change order was unauthorized and this potential liability need not be considered by the Court.

◼ Accordingly, as to appropriations, the sole remaining issue is whether the Government satisfied its burden of proving the inadequacy of appropriations for the site work. Initially, the Government contends that regardless of the amounts the Legislature may have approved, those funds were never allocated by the Budget Office to the Department of Housing and, therefore, were never formally "appropriated". This argument is, however, inconsistent with the accepted definition of "appropriation", "[t]he act by which the legislative department of government designates a particular fund, . . . to be applied to some general object of governmental expenditure, or to some individual purchase or expense". BLACK'S LAW DICTIONARY 93 (5th ed. 1979). Thus, the existence of an "appropriation" does not require that all internal mechanisms of the executive branch are activated; instead, as long as the Legislature has designated funds for use by the executive branch and the appropriation measure has received executive approval, an "appropriation" has been made.

Alternatively, the Government argues that even if some appropriations were indeed made, they were insufficient to meet, in full, the cost of the site work which the Government is obligated to perform under the Agreement. The Court has already calculated that amount.[2] In light of the definition of "appropriation" adopted above, the Government must concede that a $200,000 appropriation for the site work was made on July 2, 1973. See 1973 V.I. Sess. Laws, Act No. 3445. As to the remainder of the Government's obligation, Rich points to several potential sources of Government funds. Although Rich comes extremely close, it is unable to unearth adequate appropriations which might have been applied toward the site work so as to satisfy the legal requirements.

---

[2] $1.1 million.

 Rich correctly suggests that for the fiscal year from July 1, 1971, to June 30, 1972, the Legislature appropriated $750,000 for the "[c]onstruction of roads and site improvements, Estate Nazareth, including recreational facilities." 1971 V.I. Sess. Laws, Act No. 3054. The Government regards this appropriation as having lapsed before October 1, 1973, and, therefore, maintains that it cannot be considered as supplying funds for the obligations undertaken in the Agreement of that date. However, the prefatory language of Act No. 3054 states that the appropriations made therein "shall remain available until expended for the projects and purposes hereinafter expressly named." Hence, the appropriation of $750,000 remains valid since 33 V.I.C. § 3111 provides that an appropriation does not automatically expire at the end of the fiscal year if it is "otherwise provided by law." See 7 V.I.Op.A.G. 356. Accordingly, this $750,000 may be added to the $200,000 previously discussed and it is established that $950,000 of the $1.1 million necessary for the site work was appropriated.[3]

 As to the remaining $150,000, Rich suggests that various general appropriations could provide the money. Specifically, Rich points to the Moderate Income Housing Fund (Mr. Simmonds testified it contained $300,000 in 1973) and the Public Works Discretionary Fund (Commissioner Finch testified it contained $200,000 per year for road work in 1975). Alternatively, Rich proposes the Road Fund for General Maintenance ($800,000), a Federal Highway Grant Matching Contribution ($800,000) and a general fund for construction and improvements of roads ($1,000,000). See 1973 V.I. Sess. Laws, Acts No. 3444 and 3445. The fallacy of each of these examples, as well as several others advanced by Rich, is that the issue is not whether or not the Government had sufficient funds in its entire budget to support the contract. Instead, the issue is whether or not adequate funds were "appropriated" to enable the Government to fulfill its site improvement obligation under the Agreement. In this regard, the law is clear that general appropriations of the type relied upon by Rich cannot supply the shortfall left from inadequate specific appropriations. See 1A GOVERNMENT CONTRACTS § 8.20[1] at 8-15. Thus, there exist no appropriations as such to furnish the final $150,000 of the Government's site work obligation.

---

[3] Admittedly, some reduction in the $750,000 appropriation must be made to account for the fact that "recreational facilities" are included in the total.

 This conclusion does not totally defeat Rich's argument, however, since it has been held that substantial compliance with the appropriation requirement may suffice. See Fowler v. United States, 3 Ct. Cl. 43 (1867). Fowler interprets 41 U.S.C.A. § 11, the federal analogue to 33 V.I.C. § 3101's requirement of an adequate appropriation to consider a contract authorized. The Fowler court held that a congressional act authorizing the enlargement of the Library of Congress is "a law authorizing" a contract even though the contract slightly exceeds the appropriation made for that purpose. Id. Accordingly, the Court is compelled to consider whether the fact that $950,000 of the necessary $1.1 million was appropriated signifies that the Fowler notion of substantial compliance is satisfied in the case at bar.

There are several points in Rich's favor on the question of substantial compliance with the appropriation requirement. Most important, the escrow fund to be established pursuant to paragraph XI A of the Agreement[4] might be considered as a source of funds to fill the appropriation shortfall. The Government was required to deposit $250,000 into the fund on the date of commencement of construction of Phase I to secure the performance of its covenants to buy unsold units and to perform the site work. In addition, upon conveyance of the deeds for the Estate Nazareth property, paragraph IV A required Rich to deposit the sales price of the land, $92,400, into the identical escrow fund. The Government was prohibited from withdrawing any monies from escrow until the site work was completed and all units were sold. Since the $250,000 was never appropriated, it is apparent those funds cannot be considered as support for the Agreement. It is a much closer question, however, as to the $92,400 for the land. Although Rich never deposited these funds, the Agreement could not have proceeded for long without such a payment. Additionally, we have already mentioned that the Government could not withdraw the monies from escrow until the site work was completed. Thus, the $92,400 had an effect remarkably similar to an appropriation in the sense of the funds being set aside for a specific purpose.[5]

---

[4] The escrow fund was never established and, obviously, no funds were actually deposited in it.

[5] The Court concedes the presence of some circular reasoning in its analysis. Certainly, the requirement of a deposit and the prohibition upon using funds in escrow only come into force if the contract exists in the first place. However, the essential point remains, the $92,400 was specifically set aside to guarantee the completion to the site work.

Rich can also point to two factors suggesting that the estimate of the necessary site work appropriation is inflated. One factor is the $50,000 the Department of Housing advanced to the Department of Public Works for rough cutting of roads at Nazareth. (Exh. R-10.)[6] In effect, since the money was expended and the work actually done, it is possible to infer that the Government's remaining financial obligation for the site might have been correspondingly reduced. The second factor is the testimony at trial suggesting that the $1.1 million estimate for site work included some costs more appropriately allocable to a planned second phase of the project rather than to the 100 units which were the subject of the Agreement. Thus, Rich has several proposals for shaving down the estimate as well as for filling the appropriation shortfall.

Nevertheless, a stronger case can be made for finding that sufficient appropriations were not made since any doctrine of substantial compliance must be interpreted very narrowly. "It is well settled that contracts with agents of the Government must be in strict conformity with the authority conferred." In re Hooper's Estate, 359 F.2d 569, 577 (3d Cir. 1966) (citations omitted). Hooper goes on to state that "[t]he Government is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit." Id. (citations omitted).

In light of the Hooper mandate, the considerations weighing against finding substantial compliance overwhelm Rich's argument. Firstly, the 1972 appropriation of $750,000 essential to Rich's position includes an amount for "recreational facilities." Thus, the appropriation shortfall is necessarily increased. Secondly, although the Court concluded that the Government's contingent obligation to purchase unsold units was extremely unlikely to be enforced, the enormous potential liability remains a factor which cannot be totally ignored. Thirdly, the $250,000 that the Government was required to put into escrow, while not precisely an appropriation, was still a substantial sum essential to the Agreement for which there is no indication of Government intent or ability to set aside. Finally, although the $92,400 to be paid into escrow by Rich for the land is an equitable factor in Rich's favor, it is still not an appropriation as required by law. Accordingly, the Agreement is

---

[6] Although this represents a Government attempt to commence the project, it is not a legislative "ratification" of the contract through a post-contractual appropriation. See 1A GOVERNMENT CONTRACTS § 8.10 [1] at 8-5.

invalid under 33 V.I.C. § 3101 because it attempts to commit government funds in excess of any prior appropriation.

*(2) Transfer of Land to Housing Department (29 V.I.C. 191c)*

As a second illegality defense, the Government maintains that the Agreement is illegal because neither of the two statutes which could authorize the sale to Rich of the land essential to the Agreement, 29 V.I.C. § 191c and 31 V.I.C. § 205, were ever complied with. Section 205 is a general provision for the disposition of government real property. Subsection 205(d)(2) states that section 205 is inapplicable to the disposition of Government real estate under subchapter IX of chapter 1, Title 29, Relating to Home Ownership and Development. Since the Agreement clearly involves a contractual arrangement entered by the Department of Housing for the sale of Government land for moderate income housing under subchapter IX of chapter 1, Title 31, § 205 is not available as a basis for the transfer.

 Accordingly, compliance with the only alternative available, § 191c, is crucial to the validity of the Agreement. Under § 191c,

> [T]he Governor with the approval of the Legislature is authorized to transfer to the jurisdiction of the Department of Housing and Community Renewal, for disposal in accordance with the provisions of this subchapter, any plot or plots of land presently owned or hereinafter acquired by the Government of the Virgin Islands, if such land is not needed for any other purpose.

Rich points to Act 3005, 1971 V.I. Sess. Laws as constituting § 191c's requisite approval of the Governor and Legislature. Act 3005 states:

> all government-sponsored housing constructed on certain lands at Estate Nazareth, St. Thomas, . . . shall be constructed and offered for sale pursuant to the provisions of subchapter IX "Home Ownership and Development" of Chapter 1 and of Title 29 of the Virgin Islands Code.

Admittedly, Act 3005 is not an express transfer of the Nazareth land to the Department of Housing. Yet, in light of the Court's conclusion above that section 191c represents the sole method for disposal of Government lands for middle income housing, the logical inference to be drawn from Act 3005 is that it was intended to transfer the Nazareth land to the Department of Housing. To interpret Act 3005 otherwise would leave the Nazareth land frozen

from use for its intended purpose as well as for its prohibited purposes. Furthermore, in the context of the case at bar, this conclusion is supported by the previously enunciated rule that the burden of proving illegality is on the Government. Thus, the Court finds that Act 3005 satisfies the requirement of § 191c that the Nazareth land be transferred to the Department of Housing.

(3) *Adoption of Housing Development Plan (Act No. 3088)*

A third ground asserted by the Government for finding the Agreement illegal is the absence of legislative approval of a "housing development plan" as required by Act No. 3088, 1971 V.I. Sess. Laws at 313–14:

> To Require the Adoption of a Comprehensive Housing Development Plan Prior to the Construction of Government-Sponsored Housing Projects and for Other Purposes
>
> Be it enacted by the Legislature of the Virgin Islands:
>
> SECTION 1. Notwithstanding any other general or specific law to the contrary, no housing project, housing development or housing unit shall be constructed under the jurisdiction of the Department of Housing and Community Renewal or the Virgin Islands Housing Authority unless a "housing development plan" therefor is first adopted and submitted to the Governor and the Legislature for approval. The housing development plan required by this Act shall be a statement by words, maps, graphics and other appropriate forms of the overall proposed housing project.

There is no question of the Governor's approval since Governor Evans signed the Agreement which included plans and drawings sufficient to comply with the Act. Rich concedes, however, that the Legislature never adopted a plan sufficient to comply with Act 3088. Instead, Rich maintains that either Act 3088 was inapplicable to the Agreement or the Legislature waived its right to approve a plan.

Rich bases its contention that Act 3088 is inapplicable to the Nazareth project on the phrase "under the jurisdiction of the Department of Housing" in Act 3088. Rich interprets the phrase as limiting the Act's applicability to those situations in which the Department actually constructs a project itself or causes the housing to be constructed for ownership by it. The Court, however, reads Act 3088's coverage more broadly so that government sponsorship rather than complete government control is all that is required.

427

The Court's broader interpretation of Act 3088 is consistent with the relevant legislative enactments. Firstly, Act 3088 is entitled: "To Require the Adoption of a Comprehensive Housing Development Plan Prior to the Construction of *Government-Sponsored* Housing Projects . . ." (emphasis added). This alone indicates that the Government need not build the project itself. Secondly, the preamble to the Agreement specifically states that the Government is "acting by and through the Commissioner of Housing and the Government." This suggests that the Nazareth project is within the purview of the Department of Housing and, therefore, is covered by Act 3088. Finally, the preamble also states: "this Agreement relates to a Moderate Income Housing Project as defined in said Title 29." Yet the definition of Moderate Income Housing for Title 29 in no way implies that such projects must be constructed by the Department of Housing itself. See 29 V.I.C. § 191(b). It is logical to conclude, therefore, that Nazareth project was "under the jurisdiction of the Department of Housing" so that Act 3088 applies to the Agreement.

Rich also argues that Act 3088 is inapplicable to the Agreement because, interpreted literally, Act 3088's sole prohibition is "no housing project . . . shall be constructed" without an approved plan. Thus, technically speaking, in contrast to performing construction, a contract to construct housing without prior approval of a plan is not prohibited by Act 3088. The Court does not, however, adopt such a literal interpretation. The clear intent of the statute is to mandate approval of a plan prior to either embarking on actual construction or entering a contract to construct.

Rich's final response to the Act 3088 challenge is that the Legislature waived its right to approve the housing development plan by appropriating funds for site work in 1972 and 1973. Certainly, "[i]t is well settled that Congress may, by enactment not otherwise inappropriate, 'ratify . . . acts which it might have authorized', and give the force of law to official action unauthorized when taken." Swayne & Hoyt, Ltd. v. United States, 300 U.S. 297, 301–302 (1937) (citations omitted). Furthermore, appropriations may in some instances constitute ratifications. Associated Electric Cooperative, Inc. v. Morton, 507 F.2d 1167, 1174 (D.C. Cir. 1974). Ratifications are, however, normally associated with legislative actions following unauthorized executive conduct. In contrast, the $750,000 and $200,000 site improvement appropriations were passed prior to the October 1, 1973, Agreement. Regardless of this

428

fact it is still the notion of "ratification" that is most helpful in analyzing Rich's hypothesis that the appropriations manifested a waiver of the Legislature's right to approve a housing development plan.

 The Court has no problem with holding that the ratification by appropriation analysis is as applicable to the Virgin Islands Legislature as it is to Congress. A prime manifestation of the potential implications of an appropriation is illustrated by 33 V.I.C. § 3101, the statute on which the Government relies to defeat Rich's claim:[7]

> § 3101. Expenditures or contracts in excess of appropriations
>
> No officer or employee of the Virgin Islands shall make or authorize an expenditure from, or create or authorize an obligation under, any appropriation or fund in excess of the amount available therein; nor shall any such officer or employee involve the government in any contract or obligation for the payment of money for any purpose, in advance of appropriations made for such purpose, unless such contract or obligation is authorized by law.

The next-to-last phrase of § 3101 contains language limiting the prohibition on entering unauthorized contracts to those contracts entered "in advance of appropriations made for such purpose." Thus, the clear implication is created that when, as in the case at bar, specific appropriations exist prior to the date on which an otherwise unauthorized Agreement was signed, the contract may then be deemed authorized. Thus, the state of the law in combination with the previously established rule that the burden of proving illegality is squarely on the Government makes a strong case for Rich's theory of waiver of the Act 3088 requirements.

 The stumbling block in Rich's ratification theory is the judicially created limitation that ratification will not be found unless prior knowledge of the specific disputed action can be clearly demonstrated, D.C. Federation of Civic Associations v. Airis, 391 F.2d 478, 482 (D.C. Cir. 1968), and the appropriation plainly shows "a purpose to bestow the precise authority which is claimed." Ex parte Endo, 323 U.S. 283, 303 n.24 (1944). Courts reaching this

---

[7] The Government emphasizes that pursuant to the final phrase of § 3101 which requires the contract to be "authorized by law," the failure to formally approve a plan as mandated by Act 3088 signifies that the Agreement is illegal.

issue usually focus on the rule that when a lump sum appropriation is made for a program without amounts being earmarked for a challenged portion, no approval of that portion may be inferred. See e.g. Ex parte Endo, 323 U.S. at 303 n.24. This rule is inapplicable in the case at bar since the appropriations were specifically labeled for the Estate Nazareth Project. However, the rationale underlying the lump sum rule is extremely relevant since it emphasizes that factors attesting to the Legislature's specific knowledge of the act it ratifies must be demonstrated. See D.C. Federation of Civic Associations, Inc. v. Airis, 391 F.2d at 481.

 Thus, the ultimate question is what state of the Legislature's knowledge can be inferred from the site work appropriations. Certainly, no awareness of any waiver of the right to approve a housing development plan was exhibited by the Legislature. The Commissioner of Housing, Darwin Creque, testified that on the last day of the Ninth Legislature (1971–1972), the Legislature sat as a committee of the whole and considered the Nazareth project.[8] Yet this fact cannot be utilized to establish knowledge of the Legislature. The 1972 appropriation of $750,000 was made before the last day of the Legislature and, therefore, without the benefit of this meeting. The 1973 appropriation of $200,000 was subsequent to the meeting, but it was made by the Tenth Legislature and knowledge obtained by earlier Legislatures cannot bind subsequent ones. In addition, the fact that the proposed Agreement with Rich may have been circulating within the executive branch at the time of the 1973 appropriation in no way implies that its contents were conveyed to the Legislature. Accordingly, while Legislative appropriations for site improvements may suggest veiled approval for the Nazareth project in general, they cannot be deemed to establish either waiver or ratification of the housing development plan.[9] Thus, the absence of legislative approval of a plan as required by Act 3088 condemns the Agreement as illegal and unenforceable by Rich.

---

[8] Despite Creque's recollection that the Legislature approved the project, the Court makes no finding of formal approval since no records have been produced to substantiate that allegation.

[9] Moreover, the Court's earlier holding that the Legislature's appropriations for the Nazareth project were inadequate also implies that the appropriations should not be construed as constituting "ratification" of the project without a plan.

(4) *Cost Limitations (29 V.I.C. § 191n)*

The fourth illegality defense asserted by the Government is that the Agreement violates 29 V.I.C. § 191n[10] which sets minimum and maximum prices for the sale of government-sponsored housing. Rich maintains that since § 191n(a) expressly and § 191n(b) by implication are applicable to dwellings "erected by the Government", the statute is inapplicable to a project Rich would construct on its own. However, this literal interpretation flies in the face of the clear intent of the statute. The Agreement expressly states that it is addressed to middle income housing under Title 29 of the Virgin Islands Code. Thus, there is no question that it is subject to the dictates of 29 V.I.C. § 191n. Section 191n(a) guarantees that government efforts under Title 29 are confined to middle income housing by setting a maximum construction cost of $25,000. Section 191n(b) involves the additional step of insuring that such dwellings are sold at cost so that governmental aid is limited to reducing the profit element in the housing prices rather than to going the additional step of taking a loss. Finally, there is simply no indication that Title 29 envisioned the Government performing the actual construction of dwellings. It is logical to assume, therefore, that the language "erected by the Government" covers the situation in which the Government sponsors a project but the actual construction is completed by private enterprise.

Once section 191n's applicability to the project is confirmed, it is apparent that the Agreement fails to comply with it. The provisions of the Agreement at issue are contained in paragraph VII:

A. The selling prices of the units, the construction of which is commenced on or before October 1, 1973, shall be as follows:

| | |
|---|---|
| Two (2) Bedroom Units | $ 22,050.00 |
| Three (3) Bedroom Units | 23,525.00 |
| Four (4) Bedroom Units | 25,200.00 |

B. The selling prices of units, the construction of which is commenced after October 1, 1973, shall be the selling prices set forth above adjusted by an increase to be negotiated which shall not exceed the difference between the Construction Cost Index as published by the United States Depart-

---

[10] (a) No dwelling shall be erected by the Government at a cost of more than $25,000 exclusive of the proportional cost of the land.

(b) The minimum selling price for a dwelling shall be a sum at least equal to the Government's acquisition cost plus the cost of any additions and improvements.

ment of Commerce for the month in which such construction of respective units is commenced and the Construction Cost Index for the month of October 1973 plus 5%.

Since the Court is concerned with the validity of the Agreement as of the date it was signed, no consideration will be given to the potential effects of the escalation clause in subparagraph B.

As to the maximum price, subsection 191n(a) states that "[n]o dwelling shall be erected by the Government at a cost of more than $25,000 exclusive of the proportional cost of the land." The cost to Rich of the land for the 100 units was to be $92,400 or $924 per unit. The Court adopts this figure as the "proportional cost of the land" to be deducted. Accordingly, the $25,000 limit is satisfied for all types of units if the only costs to be considered are the price of the land and the prices at which Rich was to sell the units.[11]

However, the additional element of the site work must be considered. The Court found the cost of the site work for the 100 units to be approximately $1.1 million or $11,000 per unit. Even if a portion of the site work is allocated to the planned second phase of the project, the site work cost remains so substantial that there is no way the dwellings could have been erected with the $25,000 limitation set by section 191n(a).

Accordingly, Rich can salvage the Agreement only if it can be established that the site work expenses should not be included in the cost of construction. It might be argued that the Government would retain title to the site work so that those costs need not be tacked onto the sales price. Yet paragraph IV A of the Agreement eliminates such speculation since it expressly states that the price of the land to Rich "shall include site improvements." Perhaps a technical argument could be made that the costs of erection are somehow different in kind than the costs of site work, but such an interpretation would be inconsistent with the intent of section 191n(a) to limit the total cost of middle income dwellings. Thus, the Court concludes that the Agreement is illegal under section 191n(a) and, therefore, unenforceable by Rich.

■■■ A similar result follows from application to the Agreement of section 191n(b)'s requirement that "[t]he minimum selling price for a dwelling shall be a sum at least equal to the Government's acquisition cost plus the costs of any additions and improvements." Considering the identity of the term "improvements" in the statute

---

[11] In the list of prices in paragraph VII A of the Agreement, the maximum price, that of a four bedroom unit, is $25,200 including land.

and "site improvements" in the Agreement, it is obvious that the site work costs must be passed on to Rich and the prospective purchasers. Paragraph IV A, however, states that the land including site improvements shall be sold to Rich at $7,000 per acre. In light of the uncontradicted testimony that the acquisition cost of the land from Henry Reichold amounted to approximately $7,000 per acre (Exh. GVI-X), it is apparent that the Agreement did not satisfy the section 191n(b) standard. Moreover, it should be noted that if the Agreement had provided for the site work cost to be passed on in order to comply with section 191n(b), it would necessarily have breached the $25,000 limitation of section 191n(a). Accordingly, under both requirements of section 191n, the Agreement is illegal and unenforceable.

### D. CONCLUSION

Hence, Rich successfully eliminated the Government's first two defenses that the Agreement was not supported by consideration moving to the Government and that Rich exercised an option pursuant to the Agreement under which Rich would complete the project alone. However, of the Government's four illegality defenses, Rich was only able to counter the defense that there was no legal transfer of the necessary land to the Department of Housing as required by 29 V.I.C. § 191c. Consequently, the Government has raised three valid defenses which signify that the Agreement is unenforceable by Rich: (1) the Agreement violated 33 V.I.C. § 3101 because it created Government financial obligations in excess of appropriations; (2) the Government never adopted a Housing Development Plan for the Nazareth project as required by Act 3088, 1971 V.I. Sess. Laws at 313–314; and (3) the Agreement did not comply with the cost limitations on middle income housing established by 29 V.I.C. § 191n. A proposed Judgment will be submitted to the Court by the Government dismissing Rich's claims and rendering judgment in favor of the Government.

### II. HEYL & PATTERSON v. RICH

As compared with Rich's action against the Government, Heyl & Patterson's breach of contract action is relatively straightforward. On September 5, 1974, Rich, as developer, and Heyl & Patterson, as contractor, entered into a construction contract (Exh. R-8) under which Heyl & Patterson was to perform all the labor and provide all the materials for the one hundred units of Phase I of the Nazareth Project. Neither party challenges the validity of this contract. Heyl

433

& Patterson does contend that Rich breached Article 6 of the Contract by failing to make timely progress payments for "materials and equipment suitably stored at the site." Rich concedes that it never made any progress payments but interposes several defenses. Firstly, Rich maintains that Heyl & Patterson expressly waived its right to sue Rich for breach of contract. Alternatively, Rich maintains that its duty to make progress payments never came to fruition because either its duty was discharged due to frustration of purpose of the contract, or Heyl & Patterson failed to acquire a building permit, an alleged condition precedent to such payments.

## A. WAIVER

Rich contends that the following paragraph in Article 8 of the Contract constitutes a waiver of Heyl & Patterson's right to sue for breach of contract:

> The Contractor is aware that the work of this contract is being done pursuant to an agreement between the Owner and Government of the Virgin Islands and that the Contractor has read said contract and understands the provisions contained therein. In the event either the Owner or the Government of the Virgin Islands shall fail to comply with one or more provisions of said agreement between them, Contractor agrees it shall make no claim against the Contractor for damages or extra payment allegedly arising from said failure to comply; unless such action directly affects the dwelling unit costs.

Before addressing the scope of the waiver, the Court must first resolve a dispute as to a typographical error to determine whether the provision protects Rich or the Government. The language in question is: "Contractor agrees it shall make no claim against the Contractor (sic) . . . ." Both parties acknowledge that the first "Contractor" refers to Heyl & Patterson and that the second "Contractor" is a mistake. However, Rich maintains that the proper word is "Owner" (Rich) while Heyl & Patterson argues for "Government of the Virgin Islands."

Rich would offer two rationales in support of its interpretation. Rich asserts that since the parties negotiated for their own interest, neither would have an incentive to protect the Government. Secondly, Rich reasons that Heyl & Patterson never had the right to sue the Government for breaches of the Agreement with Rich and, therefore, there would be no necessity for waiving that right. Rich's premise that Heyl & Patterson lacked the right to sue the

Government is based on the assumption that the contract represented solely a delegation of Rich's duties under the Agreement with the Government and not an assignment of Rich's rights.

Rich's reasoning on the intended phrase is powerful, but flawed. Initially, adoption of Rich's interpretation would provide Rich with massive immunity from its own misconduct, a result extremely unlikely to have been acquiesced in by Heyl & Patterson. In addition, inserting "Owner" into the disputed phrase would be inconsistent with the subsequent paragraph in Article 8.[12] That paragraph specifically prohibits Heyl & Patterson from suing Rich for damages resulting from the Government's site development work. Yet if the disputed paragraph reads as Rich claims, then it would grant Rich blanket immunity from suits by Heyl & Patterson for Government breaches of the Agreement and, therefore, a prohibition against suits based on a specific Government obligation under the Agreement, the site work, would be totally unnecessary.

Finally, Rich's strongest argument remains: Heyl & Patterson could not have sued the Government in the first place and, therefore, the parties would not have bothered to insert a provision prohibiting such suits. Although this contention is persuasive, it loses its force in the context of a paragraph written with little care and exhibiting minimal comprehension of the applicable legal principles. In effect, the Court has no basis for presuming the parties to have been aware of the legal principles involved when it is equally reasonable to conclude that the parties mistakenly believed Heyl & Patterson would have the right to sue the Government and provided for such a contingency. Thus, the paragraph in question is not a waiver of any of Heyl & Patterson's rights against Rich.

 Yet, even if Rich prevailed on its contention that "Owner" was intended, the waiver would not apply to the case at bar. As written, the waiver applies only when "either the Owner (Rich) or the Government of the Virgin Islands shall fail to comply with" the

---

[12] The Contractor shall make no claim for damages or extra payment against the Owner for activities of the Government of the Virgin Islands for site development work done pursuant to the agreement between the Owner and Government of the Virgin Islands and further the Contractor shall make no claim for delay or damage by reason of the condition of the site, roads or utilities, and Owner shall not be held responsible for difficulty of access and further Owner shall not be required to provide access to the site or any part thereof. Work not done by Government on time shall be no cause for holdup of payment to Contractor otherwise due. The Government shall be responsible for any physical damage done to dwelling units due to their operations at the site.

Agreement. But, the resolution of Rich's claim against the Government indicates that the Agreement was illegal. Thus, the question of breach lacks any significance and the waiver clause is without consequence. Alternatively, if an illegal contract could actually be breached, the facts presented suggest that most of Heyl & Patterson's damages occurred prior to the alleged breach by the Government, the repudiation of the Agreement. Accordingly, the waiver would be inapplicable to Heyl & Patterson's damages since they were not caused by the Government's breach.

## B. MISTAKE

Even if Heyl & Patterson did not waive its right to sue for breach of contract Rich maintains that Heyl & Patterson cannot succeed on the merits since there was no breach. Rich's primary argument is that the adjudged illegality of the Rich-Government Agreement so frustrated the purpose of the Rich-Heyl & Patterson contract as to discharge Rich from its obligation to make progress payments. Unfortunately, neither of the parties' analyses of the issue is of much utility since each party incorrectly assumes that it had no reason to suspect the illegality. Rich, a party to the illegal Agreement, cannot with a straight face make such an assumption. Similarly, in light of the clause in Article 8 of the Contract in which Heyl & Patterson acknowledges that it has "read said contract (the Rich-Government Agreement) and understands the provisions contained therein," Heyl & Patterson cannot claim inadequate opportunity to discern legal improprieties. Accordingly, neither party can rely on the doctrine of existing frustration of purpose since RESTATEMENT (SECOND) OF CONTRACTS § 286 (Tent. Draft No. 9, 1974) requires that a party have "no reason to know" of the illegality, "the nonexistence of which is a basic assumption on which the contract is made."

The erroneous but not completely blameless assumption of both parties as to the validity of the Agreement suggests that the applicable law is RESTATEMENT (SECOND) OF CONTRACTS § 294 (Tent. Draft No. 10, 1975):

§ 294. WHEN MISTAKE OF BOTH PARTIES MAKES A CONTRACT VOIDABLE.

(1) Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances,

the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 296.

(2) In determining the effect of the mistakes on the agreed exchange of performances, account is taken of any relief available by way of reformation, restitution, or otherwise.

The § 294(1) doctrine of mistake covers situations in which three elements are present. Id., Comment a. There is no question on the first condition; the parties' mistake as to the legality of the Agreement relates to a "basic assumption on which the contract was made." Id. Similarly, the second element, that "the mistake has a material effect on the agreed exchange of performances," id., is easily satisfied because the Agreement's illegality completely undermines the Heyl & Patterson-Rich Contract. Less certain of fulfillment is the third requirement, that "the mistake must not be one as to which the party seeking relief bears the risk." Id. The Court now finds that if either of the two parties bear the risk, it would have to be Rich, not the party seeking relief, Heyl & Patterson.

■ Section 294 expressly refers to RESTATEMENT (SECOND) OF CONTRACTS § 296 (Tent. Draft No. 10, 1975) for resolution of the question of which party bears the risk of a mistake as to an assumption underlying a contract. The first two subsections of § 296 are clearly not controlling in the case at bar.[13] Accordingly, it is upon the catch-all phrase, § 296(c), that the Court relies. That section provides the Court with the power to allocate the risk of mistake "on the grounds that it is reasonable in the circumstances to do so." Id.

■ The circumstances of the case sub judice warrant allocating to Rich the risk of a mistake as to the legality of the Rich-Government Agreement. Firstly, Rich was more familiar with the Agreement than Heyl & Patterson. Moreover, Rich had a greater incentive, which existed over a longer period of time, to verify the Agreement's legality. Most importantly, however, is the fact that Article 6 of the Rich-Heyl & Patterson Contract provides for Rich to make progress payments for "materials and equipment suitably stored at the site." This expression as to the timing of payments of contract sums suggests that simultaneously with Rich incurring

---

[13] Section 296(a) discusses express allocations of a risk. Section 296(b) requires that the parties had been aware of a contingency but consciously ignored allocating the risk.

liability for progress payments was transferred the risk that the preliminary work represented by those payments would be rendered worthless. Still another ground for allocating the risk to Rich is Rich's option in the Agreement with the Government to do the work itself and eliminate the Government completely. The option clause is intended to give Rich flexibility in the event problems arose during the pendency of the Agreement. Although the illegality of the Agreement prohibited Rich from exercising its option, the existence of the option implies that it was Rich who would bear the risk of difficulties interfering with fulfillment of the Agreement. Thus, the Court concludes that Rich, not Heyl & Patterson, assumed the risk of illegality of the Rich-Government Agreement and, therefore, that Heyl & Patterson satisfies all the requirements of § 294(1).

Accordingly, the Court must address the question of the appropriate relief under § 294(2):

> In determining the effect of the mistake on the agreed exchange of performances, account is taken of any relief available by way of reformation, restitution, or otherwise.

Comment to § 294(2) refers to § 297 for reformation and § 300 for restitution. Reformation is clearly inappropriate in the case at bar since the illegality problem does not result from a contractual failure to express the parties' agreement on the issue. See § 297. Restitution is also inapplicable since Heyl & Patterson's activities did not "confer a benefit" upon Rich. See § 384, Comment a (Tent. Draft No. 14, 1979) ("a party's expenditures in preparation for performance that do not confer a benefit on the other party do not give rise to a restitution interest."); § 384, illustration 2. However, Comment b to § 300 provides that "[a] party may also have a claim that goes beyond mere restitution and includes elements of reliance by the claimant." It is, therefore, Heyl & Patterson's reliance interest that will form the basis for any recovery of damages.

## C. FRUSTRATION OF PURPOSE

At this juncture, it is worthwhile to discuss the frustration of purpose analysis Rich stressed as the legal basis for its complete discharge from liability to Heyl & Patterson. The Court previously rejected the underlying assumption of this theory, that at the time Rich entered the contract, it had no reason to know of the Rich-Government Agreement's illegality. Yet, even if the Court were to adopt Rich's analysis and hold that Restatement § 286(2) on

438

Existing Impracticality or Frustration governs the case at bar, Heyl & Patterson would be entitled to the identical relief granted pursuant to the § 292 mistake approach.

Thus, contrary to the conclusion reached by Rich, application of the law of frustration of purpose yields recovery for Heyl & Patterson.

Rich's reasoning is correct as far as it goes. We begin with Comment a to § 286:

> Where a party has partly performed before discovery of the impracticality or frustration, he may claim relief including restitution under the rules stated in § 265 and prospective Chapter 16. See illustration 5 and § 292(1).

The first option, § 265 (Tent. Draft No. 8, 1973), involves Part Performances as Agreed Equivalents. Rich correctly deduces that § 265 does not aid Heyl & Patterson since the construction contract at issue is a single entity and the progress payments to Heyl & Patterson were not intended to represent completion of "corresponding pairs of part performances." See id., Comment d. Rich is also on target as regards the second option, restitution as mentioned in § 292(1). As previously established, restitution is inappropriate because the work performed by Heyl & Patterson did not "confer a benefit" upon Rich. See § 384, Comment a (Tent. Draft No. 14, 1979).

The fault with Rich's analysis is that it concludes at this point, assuming that restitution or part performance are the only remedies available to Heyl & Patterson. However, even a cursory reading of § 292(1), "either party may have a claim for relief *including* restitution . . ." (emphasis added), reveals that other remedies are available. In fact, Comment b to § 292(1) specifically mentions that "[i]n a proper case recovery may go beyond mere restitution and include elements of reliance by the claimant even though they have not benefited the other party." This is precisely such a case despite Rich's convenient omission of the fact that Heyl & Patterson might have a reliance interest.

## D. NECESSITY OF BUILDING PERMIT

Prior to reaching the damage issue, the Court must address Rich's remaining arguments against recovery for partial perform-

439

ance. The only one meriting discussion[14] is the defense that a precondition to Heyl & Patterson's right to progress payments was fulfillment of Heyl & Patterson's contractual obligation to obtain a building permit. Heyl & Patterson denies that it was obligated to obtain a permit as a precondition to reimbursement for expenses in mobilizing a work force and purchasing materials. However, before dissecting the scope of the reimbursement obligation, the Court must determine whether Heyl & Patterson had the burden of obtaining a permit in the first place.

 Heyl & Patterson contends that neither of the two documents cited by Rich as the source of Heyl & Patterson's permit obligation, Form A-201 (Exh. R-8A) and the specifications (Exh. R-4), were ever made a part of the September 5, 1974, contract. Mr. Strack testified that as a matter of long-standing custom Rich always utilizes a Form A-201 with a standard A-101 contract such as the September 5th contract. Mr. Goddard, a vice-president of Heyl & Patterson, testified that this was Heyl & Patterson's first experience with the A-101 standard contract. But Mr. Gerrits, an expert witness, stated that it was customary in the industry to list all documents incorporated into a contract. Thus, since Form A-201 is not referred to in Article 8 of the Contract, the provision listing all documents incorporated by reference, it cannot be considered part of the contract. This conclusion is buttressed by the fact that although each page of the contract is initialled by the parties, no portion of the Form A-201 is initialled.

A similar problem arises with the specifications since they too were not referred to in Article 8. In contrast to Form A-201, however, the parties signed the specifications and each page is initialled. Moreover, both Mr. Strack and Mr. Rich testified that the specifications were part of the contract. However, Mr. Thompson, Heyl & Patterson's man in charge of the project at the time, states that the specifications could not have been included since they were still subject to discussion after September 5, 1974. In support of this position, both Mr. Thompson and Mr. Gerrits testified that the contract could have been negotiated solely on the basis of prelimi-

---

[14] There are two defenses. Firstly, Rich maintains that RESTATEMENT (SECOND) OF CONTRACTS § 288 (Tent. Draft No. 9, 1974) justifies withholding of progress payments. Yet § 288 is addressed solely to discharge of Rich's future obligations; it in no way suggests that Rich would not be liable to reimburse Heyl & Patterson for past efforts. Rich's final defense, that Heyl & Patterson requested progress payments for materials not in compliance with contract documents, will be discussed in the damages section.

nary drawings (Exh. R-3) and without reference to the specifications. Yet, such negotiations seem improbable to the Court. Furthermore, Mr. Thompson was unable to cite any difference between the specifications he utilized prior to September 5, 1974, and the ones allegedly incorporated into the contract.

In addition, Mr. Gerrits conceded that if he, as a contractor, received specifications with a cover letter indicating the developer mistakenly considered them to be a finalized portion of a contract, he would immediately challenge that assumption as a matter of normal custom in the industry. But Heyl & Patterson did not protest when it received exhibit HP-7, a letter dated September 14, 1974, containing the following statement:

> Enclosed find copies of 2 letters dated September 14, 1974 to Government of the Virgin Islands and 2 sets of drawings and specifications for your contract file.

█ Thus, the Court can infer that Heyl & Patterson did consider the specifications to be part of the contract. Accordingly, after evaluating all the circumstances, the Court concludes that the specifications (Exh. R-4) were included in the September 5, 1974, contract and, therefore, Heyl & Patterson had the duty of obtaining a building permit as stated in paragraph 1a. 46.1 of the specifications.

█ The ultimate question, however, is whether Heyl & Patterson's obligation is a precondition to receiving progress payments. Certainly, Article 6 of the Contract, the section describing progress payments, in no way conditions Rich's duty to make payments on the acquisition of a permit. Rich argues, however, that the necessity of a permit must be read into Article 6 since without one, it would be unreasonable for a contractor to mobilize workers and order materials. Nevertheless, Mr. Gerrits and Mr. Thompson both testified persuasively that in the context of a lump-sum contract, inflationary times and a penalty provision for delay it is customary and foreseeable for Heyl & Patterson to take such actions. Heyl & Patterson's conduct appears even more reasonable because of the September 14, 1974, notice to proceed sent by Rich (Exh. HP-7). Accordingly, the Court does not construe the contract to condition the making of progress payments upon the acquisition of a building permit.

## E. DAMAGES

■ As stated above, Heyl & Patterson is entitled to damages based on its reliance interest:

> As an alternative to the measure of damages stated in § 361, the injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance or in performance, less any net loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed.

RESTATEMENT (SECOND) OF CONTRACTS § 363 (Tent. Draft No. 14, 1979)

Two factors complicate the computation of Heyl & Patterson's damages. Firstly, although Heyl & Patterson has submitted extensive evidence of its expenditures, it has put minimal effort into demonstrating how the evidence is represented in its summary tables in exhibit HP-108. This inadequacy, in combination with the fact that the burden of proving damages is on Heyl & Patterson, has prompted the Court to resolve imprecise data in favor of Rich. Secondly, the determination is intricate because the Court has found it essential to make numerous adjustments to Heyl & Patterson's damage demand.

As a preliminary matter, since adjustments were necessary the court found it helpful to allocate freight charges and excise taxes to the appropriate expenses rather than to make separate awards for those items. Based on pages 10–11 of exhibit HP-108 and the exhibits referred to therein, the court computed the following amounts:[15]

| STEEL: | Cost | $ 88,368.73 |
| | Freight | 18,000.00 |
| | Tax | 2,790.00 |
| | | $109,158.73 |
| MAJOR MATERIALS: (except steel) | Cost | $103,829.51 |
| | Freight | 23,000.00 |
| | Tax | 3,280.00 |
| | | $130,109.51 |

---

[15] Calculations for excise taxes are rounded off to the nearest ten. Calculations for freight charges are rounded off to the nearest thousand.

| MAJOR EQUIPMENT: | Cost | $ 72,565.21 |
| --- | --- | --- |
| | Freight | 8,000.00 |
| | Tax | 2,290.00 |
| | | $ 82,855.21 |

Since plumbing materials, the miscellaneous materials and equipment were apparently purchased in St. Thomas, there are no freight charges or excise taxes for those items.

The first adjustments to Heyl & Patterson's damage request relates to the steel rebars. As had already been established, the costs of the steel including freight and tax is $109,158.73. From that price must be deducted the amount Heyl & Patterson was able to recover from resale, $41,501.68. Thus, the actual amount claimed by Heyl & Patterson for the steel is $67,657.05. Rich challenges this claim because the specifications require grade 50 steel and all the steel ordered by Heyl & Patterson was grade 40.

Rich argues strenuously the since the grade of the steel indicates its strength, the steel ordered by Heyl & Patterson is unacceptable and, therefore, no reimbursement by Rich is warranted. The testimony of Michael Fiorello, a construction expert, and Peter Brill, the architect, is clear that grade 40 is not an interchangeable substitute for grade 50. However, no witness for Rich was able to go one additional step and state that grade 40 steel was useless for the job.

For Heyl & Patterson, Floyd Thompson, the supervisor, testified that he thought the grade 40 steel could be utilized without any problem. Similarly, Dan Gerrits, a construction expert, testified that grade 40 is the standard steel utilized in the Virgin Islands. To buttress its contention that the steel was satisfactory Heyl & Patterson points out that the billings for the steel delivered to Rich stated the grade, but Rich never objected.

The Court now finds that while the steel was not of the grade specified it could, and in all likelihood would, have at least partially been utilized on the job. The Court simply finds it likely that the parties would have used a significant amount of the steel. Of course, Rich's witnesses suggested that substitution would be difficult and would involve extensive revisions in design. Moreover, it is probable that not all of the grade 40 steel could be utilized regardless of any modifications. Accordingly, the Court finds that Heyl & Patterson is entitled to reimbursement for only 50% of the cost of the steel or $33,828.53.

The next adjustment made by the Court involves the major equipment category. Including freight and taxes, Heyl & Patterson requests $82,855.21. Rich rightly criticizes Heyl & Patterson for its mitigation efforts in attempting to sell equipment. In fact, much of Heyl & Patterson's conduct in terms of resale was ineffectual since it insisted on selling most items at full cost plus freight and taxes. In addition, it let the resale process drag on for years so that items became outdated or destroyed by rust and moisture. The folly of Heyl & Patterson's efforts is illustrated by the fact that when it had an incentive to discount prices and sell rapidly, such as when it sold $60,000 worth of products during the two months immediately preceding trial, it was able to sell significant quantities.

Specifically as to the major equipment, Heyl & Patterson's only success was the sale of a concrete pump for $9,100.00 which was originally pruchased for $18,258.57. As to the remaining $64,596.64 in equipment, however, Heyl & Patterson obtained only $3,000 in sale or use value. The Court views this figure as unacceptably low. Firstly, items included in equipment, such as trucks, major office supplies and hardware, were probably the most marketable of the entire inventory. Secondly, the equipment was readily usable on Heyl & Patterson's side projects. Thus, the Court finds that 50% of the value of the major equipment could have been recovered. Accordingly, Heyl & Patterson's damage demand, exclusive of the concrete pump, will be reduced by 50% of the $64,596.64 ($32,298.32) less the $3,000.00 it actually sold. Thus, the award will be reduced by $29,298.32 to $41,456.89.

The third adjustment to Heyl & Patterson's damage demand relates to payroll. Heyl & Patterson requests $65,889.84 representing payments for workers employed by two independent contractors, Queally Construction Company and Joc's Construction Company. Initially, since Heyl & Patterson admits that the project was dead as of the August 14, 1975, meeting between Governor King and Rich, no payroll expenses after August 1975 will be allowed. Thus, the entire payroll of Joc, $2,253.13, and a portion of the Queally payroll, $1,694.33, must be eliminated.

Furthermore, payroll expenses from February 1, 1975, through August 31, 1975, are also suspect. Heyl & Patterson concedes that the Queally workers were generally idle except for the construction of the warehouse, security hut and a well at the beginning of the job. Nonetheless, Heyl & Patterson maintains that it was correct in keeping the workers on the payroll through August. According to Heyl & Patterson, layoffs would have made it impossible to mobilize

a work force quickly enough to comply with contractual deadlines if a proceed order was suddenly issued by Rich.

There are, however, two fallacies with this rationale. Firstly, since Heyl & Patterson was to some extent informed of Rich's negotiations with the Government, a decision to proceed would not come as a total surprise. Secondly, Heyl & Patterson repeatedly points to the construction work downturn in 1974–1975 to justify its lack of success in mitigating damages by selling off supplies. Yet this same fact also rebuts Heyl & Patterson's argument on layoffs because it indicates that there would be an ample work force readily available should the project be rejuvenated. Consequently, Heyl & Patterson's payroll must be reduced.

Since Floyd Thompson testified that by the end of January 1975 he knew the project was at least temporarily dead, the Queally workers should have been dismissed at that point. In fact, Thompson testified that by late January he had stopped all shipments of supplies from off-island. Hence, Heyl & Patterson is not entitled to the payroll expenses of $26,050.94 for the Queally subcontract between February 1, 1975, and August 31, 1975.

While on the subject of payroll, Floyd Thompson's $24,000 salary from September 1, 1974, to August 31, 1975, also merits discussion. In contrast to the subcontract employees, it was reasonable for Heyl & Patterson to keep Thompson, Heyl & Patterson's top man at the site, on salary through August 1975. Someone had to be present to supervise the site, conduct liquidation of supplies and be ready for the contingency of a renewal of the project. Nevertheless, it is fair to assume that 25% of Thompson's time was spent supervising Heyl & Patterson's other work on St. Thomas and on other activities unrelated to the Nazareth Project. Accordingly, Heyl & Patterson will recover only $18,000 out of Thompson's $24,000 salary for the year September 1, 1974, to August 31, 1975.

A fourth damage adjustment is appropriate for Heyl & Patterson's bill of $9,506.74 for miscellaneous services. These include what might be described as overhead expenses: electricity, telephone, photocopying and gasoline. Clearly, a significant portion of these should be allocated either to Heyl & Patterson's side projects or to general operating expenses. Consequently, Heyl & Patterson will be awarded only 50% of this amount or $4,753.37.

The Court finds the remaining damages requested by Heyl & Patterson in exhibit HP-108 to be justified:

1) Major Materials (except steel) $130,109.51

445

| | |
|---|---|
| 2) Plumbing Materials | 66,907.01 |
| 3) Miscellaneous Materials Equipment | 12,373.43 |
| 4) Site Work | 9,828.30 |

Heyl & Patterson's mitigation efforts relative to the first three materials outlays were satisfactory since it sold and used these materials for a setoff of $121,096.72 out of the total value of $209,489.95. Of course, the $121,096.72 representing sales and use of materials will reduce Heyl & Patterson's final damage award by a corresponding amount. Rich questions the plumbing materials expense since Heyl & Patterson ordered and shipped enough for the entire project rather than as needed. Nonetheless, the Court finds Heyl & Patterson's actions reasonable since cost savings could be achieved through economies of scale.

There remain two additional adjustments to Heyl & Patterson's damages which must be computed. One is necessary to account for the value of items still remaining in the warehouse which have not been sold or utilized by Heyl & Patterson. Douglas Crotwell, the warehouse manager, testified that the value of the items remaining as of the date of trial in May 1979 was $20,000. Edmund Strack inventoried the goods in the warehouse on March 16, 1979, and valued them at $80,000. (See Exh. R-33.) Yet, Strack's estimates were apparently based on purchase price rather than present value and also did not account for items sold between March and the date of trial. Hence, Crotwell's $20,000 figure is adopted by the Court.

Heyl & Patterson maintains that even the reduced figure of $20,000 is too high. According to Mr. Tolan, it would be more expensive to sell the remaining goods than they are worth. Moreover, Tolan states that Heyl & Patterson will not pursue any additional contracts in the Virgin Islands so that it cannot utilize the remaining goods here and they are not worth shipping elsewhere. Nonetheless, the $20,000 figure will stand. To the extent Heyl & Patterson is stuck with worthless materials it is its own fault since its efforts to sell the goods were tardy and somewhat ineffectual.

A final adjustment to Heyl & Patterson's recovery is appropriate to account for Heyl & Patterson's use in its side projects of the warehouse, security hut and any other facilities at Nazareth not previously mentioned. Since the side projects were minor as compared with the size of the Nazareth Project, only a small sum is warranted. Accordingly, the Court will reduce Heyl & Patterson's damage request by an additional $5,000.

■ In conclusion, the following list summarizes Heyl & Patterson's damages:

| Item | Billing Amounts | Adjustments | | Reimbursement |
|---|---|---|---|---|
| Steel | $109,158.73 | Resale: | $ 41,501.68 | |
| | | Wrong Grade: | 33,828.53 | |
| | | | | $ 33,828.53 |
| Major Equipment | 82,855.21 | Resale: | 12,100.00 | |
| | | Failure to | | |
| | | Mitigate | 29,298.32 | |
| | | | | 41,456.89 |
| Payroll | 65,889.84 | Post 8/31/75 | 3,947.46 | |
| | | Post 1/31/75 | 26,050.94 | |
| | | | | 35,891.44 |
| Thompson Salary | 24,000.00 | Side jobs | 6,000.00 | |
| | | | | 18,000.00 |
| Miscellaneous Services | 9,506.74 | Side jobs | 4,753.37 | |
| | | | | 4,753.37 |
| Major Materials (*except steel*) | 130,109.51 | | | 130,109.51 |
| Plumbing Materials | 66,907.01 | | | 66,907.01 |
| Miscellaneous Materials & Equip. | 12,373.43 | | | 12,373.43 |
| Site Work | 9,828.30 | | | 9,828.30 |
| Subtotals | $510,628.77 | | $157,480.30 | $353,148.48 |

| Final Adjustments: | SALE OR USE OF MATERIALS (except steel & major equipment) | 121,096.72 | |
|---|---|---|---|
| | MATERIALS REMAINING IN WAREHOUSE | 20,000.00 | |
| | USE OF FACILITIES ON SIDE JOBS | 5,000.00 | |
| | | | (146,096.72) |
| Totals | $510,628.77 | $303,577.02 | $207,051.76 |

## F. PREJUDGMENT INTEREST

■ RESTATEMENT (SECOND) OF CONTRACTS § 368 (Tent. Draft No. 14, 1979) provides for the payment of interest as damages to an injured party to compensate for the inability to use a promised performance from the date it was due:

## § 368. INTEREST AND DAMAGES.

(1) If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled.

(2) In any other case, such interest may be allowed as justice requires on the amount that would have been just compensation had it been paid when performance was due.

■ Heyl & Patterson's claims against Rich fall within the scope of § 368. Rich breached the contract by failing to make progress payments which were clearly due. See id. Comment b.[16] Heyl & Patterson is, therefore, entitled to interest representing the use it could have made of the money had it been timely paid. In fact, § 368, Comment c specifically refers to installments due on a construction contract.

The difficulty with awarding prejudgment interest is that § 368(1) requires that the amount due be definite. Heyl & Patterson argues that its monthly billings to Rich from November 1974 to April 1975 are sufficiently definite. Heyl & Patterson contends that Rich can then raise whatever deductions from the billings are warranted. Unfortunately, Heyl & Patterson's methodology is theoretically sound but tremendously burdensome. Accounting for all of the adjustments made by the Court as well as the timing of the purchases and selling off of items is an immense task.

---

[16] The contract between Rich and Heyl & Patterson, exhibit HP-1, provides as follows:

### ARTICLE 6

### PROGRESS PAYMENTS

Based upon Applications for Payment submitted to the Architect by the Contractor and Certificates for Payment issued by the Architect, the Owner shall make progress payments on account of the Contract Sum to the Contractor as provided in the Conditions of the Contract as follows:

On or about the 25th day of each month 90% of the proportion of the Contract Sum properly allocable to labor, materials and equipment in the Work and 90% of the portion of the Contract Sum properly allocable to materials and equipment suitably stored at the site or at some other location agreed upon in writing by the parties, up to the 25th day of that month, less the aggregate of previous payments in each case; and upon Substantial Completion of the entire Work, a sum sufficient to increase the total payments to 90% of the Contract Sum, less such retainages as the Architect shall determine for all incomplete Work and unsettled claims.

10% retention shall be held until a unit is sold or for two months whichever is a shorter period of time after completion of a unit.

448

The Court finds it preferable to proceed under § 368(2) which allows for the payment of interest on a generalized estimate of "the amount that would have been just compensation had it been paid when performance was due." Thus, judicial discretion will supplement the difficulties the parties may have encountered in establishing a proper tender by Rich. Yet, the essence of § 368 is still accomplished since Heyl & Patterson's claims are of the type addressed by that section. See § 368, illustration 9. The alternative would be a windfall to Rich due to the five-year delay between the breach of contract and judgment.

The Court will determine the sum upon which prejudgment interest will be granted based upon the summary of Heyl & Patterson's damages. Hence, the Court's analysis begins with the final damage figure of $207,051.76. From that amount the following reimbursement calculations will be deducted:

| | |
|---|---:|
| Steel | $ 33,828.53 |
| Major Equipment | 41,456.89 |
| Thompson Salary | 18,000.00 |
| | $ 93,285.42 |

The controversy over the grade of the steel signifies that there was never a sufficiently precise amount prior to trial to have warranted a tender by Rich. No allowance will be made for major equipment because Heyl & Patterson apparently would not bill Rich for that expense until the completion of the contract. Finally, Thompson's salary is excluded because it was in the nature of a general expense not to be included in the monthly billings. However, the Court finds that the remaining billings totalling $113,766.34 were sufficiently definite to entitle Heyl & Patterson to prejudgment interest in light of all the circumstances.

The date after which prejudgment interest will be computed is April 30, 1975. At that point Rich had all the billings it would receive from Heyl & Patterson. Furthermore, it is close to the midpoint between the initiation of the contract and the final death blow of the meeting in August 1975. In addition it is a logical midpoint of the time during which Heyl & Patterson was actually paying its expenses in contrast to billing them. Also, it is in-between the time Heyl & Patterson incurred its expenses and the time Heyl & Patterson should have accomplished a mitigation of its damages by selling off its inventory.

■ Lastly, interest will be computed at the rate of 9% per annum. According to § 368, Comment a, "[i]t is payable without compounding at the rate, commonly called the legal rate, fixed by statute for this purpose." See 11 V.I.C. § 951(a) (4) (Supp. 1977).

A proposed Judgment will be submitted to the Court by Heyl & Patterson.